UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

LINDA WELCH,

                Plaintiff,

vs.                                                  **Case No. 8:06-cv-2100-T-27MSS**

JIM AARTMAN, INC.,

                Defendant.

_____/

## ORDER

**BEFORE THE COURT** is Defendant's Motion for Summary Judgment (Dkt. 15), to which

Plaintiff has responded in opposition (Dkt. 37). Upon consideration, Defendant's motion for

summary judgment is DENIED.

### *Background*

Plaintiff Linda Welch brings this action pursuant to Title VII of the Civil Rights Act, 42

U.S.C. §§ 2000e *et seq.*, and the Florida Civil Rights Act ("FCRA"), Fla. Stat. §§ 760.01 *et seq.*

Plaintiff alleges that she was sexually harassed by her supervisor, Roger Marlow, and that this

harassment culminated in a shift transfer, loss of her secondary cleaning job, suspension with pay,

and ultimate termination. Plaintiff also alleges that Defendant retaliated against her for reporting the

harassment.

In August 2005, Plaintiff began working as a dispatcher for Defendant Jim Aartman, Inc.,

a trucking company, at its Mulberry, Florida terminal. (Pl. Dep. at 173-74). When Plaintiff first

began working for Defendant, she reported to Roger Marlow ("Marlow"), the company's Vice

1

President of Eastern Operations and the alleged harasser. (Pl. Dep. at 171; Marlow Dep. at 18). Marlow's office was located in the Mulberry terminal. (Marlow Dep. at 35). Plaintiff and Marlow previously worked together at Indian River Transport Company ("Indian River"), another local trucking company. (Pl. Dep. at 130-31). At some point after she was hired, Plaintiff began reporting to Chris Hyde, the Terminal Manager.  (Pl. Dep. at 169-71).   In December 2005, Marlow fired Hyde, effective January 1, 2006. (Pl. Dep. at 171; Marlow Dep. at 20-21).   Between the time Hyde was fired and during the events at issue, Defendant does not dispute that Marlow was acting as Plaintiff's supervisor. (Pl. Dep. at 199-200).

After Plaintiff was hired, Defendant moved Plaintiff from her weekend dispatcher position to the night shift. (Pl. Dep. at 164, 174, 176). Around November 2005, Hyde promoted Plaintiff to the day shift. (Pl. Dep. at 173, 176; Marlow Dep. at 34).  According to Defendant, Plaintiff had difficulty with the faster pace of the day shift, which led to several incidents in which Plaintiff incorrectly assigned drivers to loads. (Maits Dep. at 58-62). Marlow told Hyde to talk to Plaintiff about her performance issues. (Marlow Dep. at 35). When Hyde spoke with Plaintiff, she told him that she was not receiving adequate training from Michelle Maits, the Lead Dispatcher, and Faye Isom, another dispatcher. (Pl. Dep. at 172). She also alleges that she experienced problems because Maits would allocate her drivers to other loads during the night shift. (Pl. Dep. at 171-72).

In addition to her dispatching job with Defendant, Plaintiff ran a cleaning business on the side, and she was paid $200.00 biweekly to clean the terminal's office. (Pl. Dep. at 89-90; 287). This payment was made to her as an employee and was included in her regular paycheck. (Pl. Dep. at 89-90). A few weeks after she began working for Defendant, Plaintiff also started cleaning the home of Marlow and his wife, Stephanie Marlow, who was the terminal's Office Manager. (Pl. Dep.

2

at 90, 230; Marlow Dep. at 66).

a.    *The alleged sexual harassment*

On December 28, 2005, Marlow called the terminal around 7:30P.M. or 8:15P.M. to speak with Plaintiff. (Pl. Dep. at 232, 225).  Marlow asked Plaintiff to come by his house to talk about a raise they had discussed earlier, to bring a box of papers from the office, and to give her money that the Marlows owed her for cleaning. (Pl. Dep. at 232).  Marlow told her it would be fine because he and Mrs. Marlow would still be up.  (Pl. Dep. at 225).

On her way to the house, Plaintiff had a conversation on her mobile phone with Walt Ringdahl, a driver.  (Ringdahl Dep. at 10, 140).  Ringdahl told her that Marlow was a "snake" and to be careful.  (Pl. Dep. at 141; Ringdahl Dep. at 140).  When Plaintiff arrived and Marlow opened the door, she testified that he startled her and she dropped the phone in her pocket without turning it off.  (Pl. Dep. at 153).  As a result, Ringdahl overheard parts of the ensuing conversation between Plaintiff and Marlow.  (Pl. Dep. at 147; Ringdahl Dep. at 138-39).

When Plaintiff arrived at the Marlows' house, she went inside and stood in the hallway.  (Pl. Dep. at 219, 226).  Marlow went into the bedroom to get money for Plaintiff.  (Pl. Dep. at 219).  Plaintiff testified that she "felt funny" because she did not see Mrs. Marlow anywhere.  (Pl. Dep. at 220).  When she asked Marlow where his wife was, he told her that she left to take their son to her sister's house.  (Pl. Dep. at 220).  Marlow asked Plaintiff to come into the bathroom and look at a stain.  (Pl. Dep. at 220).  Plaintiff stood at the door and looked at a stain in the shower, which she thought was mildew, and told him to put bleach on it. (Pl. Dep. at 220).  Plaintiff testified:

> I didn't even turn around before he was already at the door, and he had his arm up and wouldn't let me by.  And then he started saying things to me, how beautiful I was, how he always wanted me when I worked at Indian River and, you know, if I would just, you know, be with him.  And then he started talking about him and

Stephanie having problems and they were putting their house up for sale and they were going to get a divorce. And, you know, I said, I don't know what's going on here, Roger. I said, but you have a wonderful wife and you need to -- you know, I don't know what's going on with you, I said. She's a wonderful wife and there's no reason for you doing this to her. And I said, you're crazy. You're just being a fool. And he just went on to say, you know, I want you and then tried to kiss me . . . . (Pl. Dep. at 221).

Plaintiff testified that "he was just pressing his lips against mine real hard" and that she pushed him away. (Pl. Dep. at 221-22). Plaintiff also testified that he "had his hands on my sides and on my shoulders and around touching me," that "he had his hands on my rear end," and that "[h]e had his hand over my breast." (Pl. Dep. at 222). Plaintiff pushed him away and told him stop, but he "kept telling me how much he cared about me." (Pl. Dep. at 222-23). He told her that "I would never have to worry about a job again if I was with him" or about supporting her children. (Pl. Dep. at 289-90). Plaintiff told him she wanted to leave and "ran out the door." (Pl. Dep. at 223). Marlow ran after her saying "Please come back, that Stephanie wouldn't be home . . . I'll be up all night long. And I said, no, no way." (Pl. Dep. at 225).

When Plaintiff arrived at work the following day, Marlow was sitting at her desk, "going through my computer and stuff." (Pl. Dep. at 238). They did not say anything to each other, and Marlow then went to his office. (Pl. Dep. at 238). When he got upstairs, he called her on the intercom to come to his office, where he gave her some instructions on a new account. (Pl. Dep. at 238). She testified that as she started to walk out the door he told her to "shut the door" and said "don't you tell anybody about last night . . . if you do, you'll lose your job." (Pl. Dep. at 239).

b.    *Subsequent employment actions*

On or about January 6, 2006 or January 9, 2006, Maits told Plaintiff she was being put back on the night shift. (Pl. Dep. at 175). When Plaintiff asked the reason for this decision, Maits told

4

her that was what Marlow wanted.  (Pl. Dep. at 175).   Anthony Meli, the Director of Human Resources, asserts that this change was made because Plaintiff could not handle the increased responsibility and customer contact during the day shift.  (Maits Dep. at 58, 115; Meli Aff. ¶ 6). Plaintiff's pay did not change as a result of this transfer.  (Pl. Dep. at 296).

Also during the first week of January, Plaintiff lost her job cleaning the terminal.  (Meli Aff. ¶ 5).  Meli avers that Plaintiff lost this job due to complaints from other employees about the office areas not being properly cleaned.  (Meli Aff. ¶ 5).  As discussed in detail below, there are disputed issues of fact regarding the extent of Marlow's involvement in this decision.

Plaintiff did not report the December 28, 2005 incident to anyone until January 23, 2006, when she told Mrs. Marlow.  (Pl. Dep. at 225).  Plaintiff testified that she told Mrs. Marlow because she was the only manager at the terminal other than Marlow.[1]  (Pl. Dep. at 225, 236-37).  Plaintiff then immediately received a call from Marlow, who asked "what the hell have you been telling my wife?  She thinks we have been sleeping together."  (Pl. Dep. at 203).  Plaintiff told him she that did not know what he was talking about.  (Pl. Dep. at 203).  Marlow called her two or three more times. (Pl. Dep. at 203).  Marlow's brother, Jimmy, also called Plaintiff and told her to call Mrs. Marlow and explain things to her.  (Pl. Dep. at 203-4).  When Plaintiff hung up the phone, Marlow called again and threatened that "if he lost his job that he would have four meals a day in prison and he would -- I would be -- I think he said six foot under."  (Pl. Dep. at 205, 208-09).

Marlow called both Maits and another dispatcher, Wanda Ward.  Ward testified that Marlow said that "if anybody caused him to lose his job, he was going to make sure they got fired, and that

---

[1] It is undisputed that Defendant has a "Policy against Harassment."  (Meli Aff., Exh. 2).  Defendant's policy directs employees to promptly report any incident of harassment to the employee's supervisor, "any other manager, or directly to the Director of Human Resources."  (Meli Aff., Exh. 2 at 1).  Plaintiff testified that she was aware of the policy.  (Pl. Dep. at 182).

he wasn't losing his job over anyone." (Ward Dep. at 31). Marlow ordered Maits to go to the terminal and suspend Plaintiff that night. (Pl. Dep. at 207, Exh. 22; Maits Dep. at 79). He did not provide a reason. (Maits Dep. at 79). Marlow testified that he was concerned Plaintiff had "flipped [her] lid" and would delete computer records. (Marlow Dep. at 66). While Marlow admitted the suspension could be seen as retaliatory, he contends that his concern was that the terminal, which he built from scratch, would be thrown into chaos if Plaintiff deleted computer records. (Marlow Dep. at 71-72).[2] Maits went to the dispatch office and suspended Plaintiff without giving her a reason. (Pl. Dep. at 217-18; Maits Dep. at 79).

c.      *The investigation and Plaintiff's termination*

Meli began investigating the following day. (Marlow Dep. at 72; Pl. Dep. at 201-02). Plaintiff testified that during her interview with Meli, he focused on her job performance and "he wanted to talk about everything but the sexual harassment." (Pl. Dep. at 274). Meli told Plaintiff that it was "my word against Marlow's word." (Pl. Dec. ¶ 8). Meli personally interviewed Plaintiff, Marlow, Mrs. Marlow, Maits, Hyde, Isom, and Ward. (Meli Aff., Exh. 1). Meli did not interview Ringdahl, who had allegedly overheard portions of the incident. (Ringdahl Dep. at 133-34). Meli avers "I could find no substantial evidence or witness testimony to support Ms. Welch's allegations of sexual harassment." (Meli Aff. ¶ 4).

Plaintiff's suspension with pay was lifted, effective February 10, 2006, when she returned to work. (Pl. Dep. at 245-46, Exh. 23). Plaintiff's supervisor was changed from Marlow to Maits. (Pl. Dep. at 200, Exh. 23). Marlow received an Employee Feedback Form, which noted that

---

[2] Marlow testified that Plaintiff brought him bills of lading and customer rate information from Indian River, and that he was therefore concerned about Plaintiff's access to Defendant's computer system. (Marlow Dep. at 63-66). Plaintiff contends that she gave the information to Marlow only after he insisted that she do so. (Pl. Dec. ¶ 4).

employment actions were not properly documented at the terminal and that Marlow's arrangement with Plaintiff to provide cleaning services was in direct violation of company policy. (Marlow Dep., Exh. 1).[3]

In addition, because Plaintiff specifically complained to Meli that she had not received adequate training as a dispatcher, he worked with Maits to develop a training program for dispatchers. (Meli Aff. ¶ 8). All dispatchers were entered into the program. (Meli Aff. ¶ 9). As set forth below, Defendant ultimately terminated Plaintiff based, in part, on her alleged refusal to participate in training. (Meli Aff. ¶ 10).

On Plaintiff's first night back at work, Maits gave Plaintiff and another dispatcher, Steve Stailey, a training form entitled On the Job Training Record ("Training Record"). (Pl. Dep. at 245-47, Exh. 26). Plaintiff and Stailey asked if they could take the Training Record home to review before filling it out, which they did. (Pl. Dep. at 249). Maits did not work on the weekend or Monday. (Pl. Dep. at 249-50). On Monday, Isom told Plaintiff that Maits would not be in that night and that Maits had told Isom just to sign the Training Record. (Pl. Dep. at 249). Plaintiff told Isom that she wanted to go over it with Maits before she gave it to her. (Pl. Dep. at 249). When Plaintiff talked to Maits Monday night, Maits did not mention the Training Record. (Pl. Dep. at 250). Maits also testified she did not ask her for the Training Record. (Maits Dep. at 126).

The next night Plaintiff worked was February 16, 2006. (Pl. Dep. at 250). When Plaintiff arrived, Maits remained for about an hour, talking with Isom. (Pl. Dep. at 253). When Maits got ready to leave, she presented Plaintiff with an Employee Feedback Form ("Feedback Form") and told

---

[3] The referenced "employment actions" appear to refer to the actions taken against Plaintiff. (Meli Aff., Exh. 1 at 5-6). Specifically, Meli stated in his investigative notes that "[t]his incident could have been confined to consideration of the alleged incident at Roger's house if there had been documentation in place to support the adverse employment actions taken with Linda Welch." (*Id.* at 5).

Plaintiff to sign it. (Pl. Dep. at 254). The Feedback Form stated in part: "You have refused to work with your supervisor, Michelle Maits, in completing your On-the-Job training record. Your refusal is considered insubordination and is in violation of the Jim Aartman, Inc. 'Standards of Conduct . . . .'" (Pl. Dep., Exhs. 28, 29). Maits told Plaintiff that the Feedback Form was from Meli. (Pl. Dep. at 256).

Plaintiff explained to Maits that she had not signed the Training Record because she was waiting to see Maits. (Pl. Dep. at 256). Plaintiff refused to sign the Feedback Form because she felt it was false. (Pl. Dep. at 257-58). Maits again demanded that she sign the Feedback Form and Plaintiff again refused unless Maits corrected it. (Pl. Dep. at 258). Plaintiff then said that she could not handle the harassment and tried to leave. (Pl. Dep. at 258-59). Plaintiff alleges that Maits tripped her, causing Plaintiff to fall into Maits. (Pl. Dep. at 259). According to Plaintiff, Maits then said "Faye, Faye, Look at this. Linda just hit me." and Isom told Maits to stop it and to "cool it." (Pl. Dep. at 259). Ward testified that Maits was later "bragging about how she set Linda up, how she tripped her and made her fall into her." (Ward Dep. at 12-13). Maits maintains that she was not trying to block Plaintiff. (Maits Dep. at 134-35).

Plaintiff called the Sheriff's Department. (Pl. Dep. at 259). Maits called Meli and told him that Plaintiff was mad, was cussing at her, and that she had called the police. (Maits Dep. at 135-37). Meli told Maits to call the police and to "Just forget it. Just let her go." (Maits Dep. at 138). When law enforcement arrived, they told Plaintiff to leave immediately because she had been fired. (Pl. Dep. at 260; Maits Dep. at 140). Meli avers that Plaintiff's "refusal to participate in the program and unwillingness to work in harmony with her coworkers resulted in the termination of her employment." (Meli Aff. ¶ 10).

8

*Standard*

Summary judgment is proper if following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56. "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* at 1260. All the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004).

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 323-24. Plaintiff's evidence must be significantly probative to support the claims. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).

The Court will not weigh the evidence or make findings of fact. *Anderson*, 477 U.S. at 249; *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). Rather, the Court's role is limited to deciding whether there is sufficient evidence upon which a reasonable juror could find for the non-moving party. *Id.*

9

### Discussion

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e-2(a)(1).[4]  Intentional discrimination may be proven through either direct or circumstantial evidence.   Direct evidence is "evidence, which if believed, proves existence of fact in issue without inference or presumption." *Rollins v. TechSouth, Inc.,* 833 F.2d 1525, 1528 n. 6 (11th Cir.1987); *see also Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189-90 (11th Cir. 1997) (surveying direct evidence cases).   In the instant case, Plaintiff has not alleged any direct evidence of discrimination.

Claims of retaliation and disparate treatment based on circumstantial evidence are analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-03 (1973).   First, a plaintiff must establish a prima facie case of discrimination.  *Id.*; *Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1087 (11th Cir. 2004).   If the plaintiff sustains this burden, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions.  *Id.* The presumption of discrimination is then rebutted, and "the burden of production shifts to the plaintiff to offer evidence that the alleged reason of the employer is a pretext for illegal discrimination." *Wilson,* 376 F.3d at 1087.   The *McDonnell Douglas* burden-shifting framework does not apply to claims for sexual harassment. *Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 510 (11th Cir. 2000).

---

[4] Plaintiff brings parallel claims pursuant to the FCRA.  Because decisions construing Title VII are applicable to FCRA claims, Plaintiff's claims are analyzed concurrently.  *Harper v. Blockbuster Entm't Corp.,* 139 F.3d 1385, 1389-90 (11th Cir.1998).

### A.   *Sexual Harassment*

In Count I of the Complaint, Plaintiff alleges that she was subject to sexual harassment based on the December 28, 2005 incident at Marlow's residence and the ensuing employment actions taken by Defendant. To establish a prima facie case of sexual harassment, Plaintiff must show: (1) that she belongs to a protected group; (2) that she has been subjected to unwelcome sexual harassment; (3) that the harassment was based on her sex; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that a basis for holding the employer liable exists. *Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1231 (11th Cir. 2006).[5] For the purposes of the motion for summary judgment, Defendant does not contest the first three factors. (Dkt. 15 at 8).

### 1.   *Defendant's vicarious liability*

Defendant first argues that it is not liable for Marlow's harassment because it can successfully raise the *Faragher-Ellerth* affirmative defense to employer liability. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998). To prevail on this defense, Defendant must demonstrate by a preponderance of the evidence that: (1) it exercised reasonable care to prevent and correct promptly any harassing behavior; and (2) Plaintiff unreasonably failed to take advantage of any preventative or corrective opportunities provided by Defendant to avoid harm otherwise. *Id.*; *Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1313 (11th Cir.2001). The *Faragher-Ellerth* defense is not available to employers,

---

[5] The previous distinction between "quid pro quo" and "hostile work environment" claims no longer governs the analysis. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 751 (1998) ("The terms *quid pro quo* and hostile work environment are helpful, perhaps, in making a rough demarcation between cases in which threats are carried out and those where they are not or are absent altogether, but beyond this are of limited utility"); *Johnson* , 234 F.3d at 508 n.7.

however, "when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." *Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 808.

Plaintiff argues that Marlow's harassment did, in fact, culminate in four tangible employment actions -- Plaintiff's transfer back to the night shift, the loss of her cleaning job, her suspension with pay, and her ultimate termination -- and that the defense is therefore not available. As set forth below, the Court finds that disputed issues of material fact exist, precluding Defendant's reliance on the *Faragher-Ellerth* defense at this stage of the litigation.

a.   *Plaintiff's termination*

Plaintiff's termination on February 16, 2006 is clearly a tangible employment action. However, to defeat the application of the *Faragher-Ellerth* defense, a tangible employment action must be taken by the harassing supervisor, either directly or by participating in or influencing the decision. *See Ellerth*, 524 U.S. at 762; *Johnson*, 234 F.3d at 511, 511 n.11 (finding issue of fact where evidence was conflicting as to alleged harasser's influence); *see also Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1250 n.23 (11th Cir. 1998) (noting that affirmative defense may not be available if harasser uses actual decisionmaker at a "cat's paw").

Although Marlow threatened Plaintiff with termination if she reported the harassment, Plaintiff cites no record evidence indicating that Marlow was involved in any employment decisions involving Plaintiff after the investigation. (Marlow Dep. at 81-84). Rather, the evidence reveals that Meli, perhaps in conjunction with Maits, made the decision to fire Plaintiff. Accordingly, Plaintiff fails to defeat the *Faragher-Ellerth* defense based on her termination, standing alone. *Ellerth*, 524 U.S. at 762-63; *Arnold v. Tuskegee Univ.*, 212 F. App'x 803, 808 (11th Cir. 2006) (finding no

evidence that employment actions taken by person who was not harasser were taken "*because* of her sex").

b.    *The remaining employment action*s

The pertinent issue is whether the remaining employment actions -- Plaintiff's transfer to the night shift, the loss of her cleaning job, and her suspension with pay -- constitute tangible employment actions that were participated in or directed by Marlow. A tangible employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 761; *Brown v. Snow*, 440 F.3d 1259, 1266 (11th Cir. 2006) (noting that "the definitions of tangible employment actions and adverse employment actions are essentially the same"). Plaintiff must demonstrate that a reasonable person in her position would have found Defendant's actions to be materially adverse under all the facts and circumstances. *Johnson*, 234 F.3d 512-13; *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) (imposing "materially adverse" objective standard in Title VII retaliation cases).

Plaintiff's loss of her cleaning job in January 2006 was accompanied by a $200 biweekly reduction in pay. Regardless of whether this action is considered as a separate termination or merely a reduction in pay, it constitutes a "significant change in benefits." It is therefore sufficient, by itself, to demonstrate a tangible employment action. *See Gillis v. Ga. Dep't of Corrections*, 400 F.3d 883, 888 (11th Cir. 2005) (finding that failure to receive $912.36 annual raise was adverse employment action).

Moreover, Defendant's actions are considered both individually and collectively. *Akins v. Fulton County*, 420 F.3d 1293, 1301 (11th Cir. 2005). When the loss of Plaintiff's cleaning job is

13

considered in conjunction with Plaintiff's contemporaneous transfer to the night shift and suspension with pay two weeks later, there is ample evidence demonstrating that a reasonable person in Plaintiff's position would have found these actions materially adverse.[6]   Plaintiff therefore establishes that she suffered a tangible employment action.

c.      *Marlow participated in or directed these actions*

The record is rife with factual inconsistencies regarding the extent of Marlow's involvement in terminating Plaintiff's cleaning job. Meli avers that during the course of his investigation "I found that Chris Hyde, not Roger Marlow, removed Welch from her secondary job of cleaning the terminal office areas." (Meli Aff. ¶ 5). Meli does not elaborate on the basis for his conclusion. By contrast, Meli's notes from his interviews with Marlow and Maits both support an inference that Marlow directed or was involved in the decision.[7]   Marlow testified during his deposition that terminating Plaintiff's cleaning job was Hyde's idea, although he discussed it with Hyde and sanctioned the decision. (Marlow Dep. at 39). Marlow also testified that he was "bending [Hyde's] ear" about Plaintiff's performance issues. (Marlow Dep. at 76). In addition, there is a January 17, 2006 email

---

[6] The Court does not determine whether Plaintiff's suspension with pay and transfer to the night shift were, individually, tangible employment actions. *Cf. Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 920 (11th Cir. 1993) (finding adverse employment action where plaintiff was suspended with pay for thirty days)*; but see Moore v. Miami-Dade County*, No. 02-33421, 2005 WL 3273722, at *11 (S.D.Fla. Sep. 30, 2005) (in First Amendment retaliation case, citing cases for proposition that administrative leave with pay and benefits is not an adverse employment action). The Court notes that Plaintiff presents no specific evidence that either of these actions involved a reduction in pay or benefits, an increase in job responsibilities, a loss of other job opportunities, or a loss in prestige. *Cf. Cotton*, 434 F.3d at 1232 (noting that "[a] tangible employment action 'in most cases inflicts direct economic harm'"); *Johnson*, 234 F.3d at 512 (noting that transfer may otherwise fit the definition of tangible employment action). Plaintiff did testify, however, that the transfer to day shift was a promotion and that it allowed her to spend time with her children. (Pl. Dep. at 173, 293).

[7] Specifically, the investigative notes from Meli's interview with Maits state: "Faye [Isom] was supposed to tell Linda per Roger. Faye probably shouldn't have been asked to do this." (Dkt. 20-2 at 57). Isom confirms that she was going to tell Plaintiff, but did not have an opportunity to do so before Plaintiff discovered a new cleaning person had started. (Dkt. 20-2 at 64). The notes from Meli's interview with Marlow state that Marlow thought Plaintiff wanted to falsely accuse him of harassment because he took her off the day shift and "stopped her cleaning arrangement." (Dkt. 20-2 at 47, 49).

from Marlow to three other employees stating that "[w]e will no longer have an employee do the cleaning on the side" and directing the employees to pay the new cleaning person. (Dkt. 20-2 at 21). Based on this conflicting evidence, including Marlow's own testimony, the record evidence is sufficient to create a disputed issue of material fact as to whether Marlow directed or participated in the decision to end Plaintiff's cleaning job. *See Johnson*, 234 F.3d at 511 (finding disputed issue of fact where there was evidence harasser "participated" in decision).

There is a similar factual dispute with respect to Plaintiff's transfer to the night shift. Plaintiff testified that Maits told her that Marlow wanted Plaintiff back on the night shift.[8] Maits testified that she did not remember whether she made the decision to transfer Plaintiff to nights, but that Marlow "would have been the one to tell me whether or not I was allowed to do that." (Maits Dep. at 114). Based on this evidence, there is an issue of fact as to whether Marlow directed or participated in the decision to transfer Plaintiff back to the night shift.

Finally, with respect to Plaintiff's suspension with pay, it is undisputed that Marlow ordered this action. Accordingly, there is sufficient record evidence to create a disputed issue of fact as to whether Marlow directed or participated in each of the three challenged employment actions.

d.      *The harassment culminated in the tangible employment actions*

Lastly, Plaintiff has produced evidence sufficient to create an issue of fact as to whether the employment actions were "causally related to the incident of harassment." *Cotton*, 434 F.3d at 1231-32. Defendant argues that the loss of Plaintiff's cleaning job and transfer to the night shift were justified due to Plaintiff's job performance problems. On the other hand, Plaintiff disputes this assessment of her performance, noting that she had never been written up for performance issues and

---

[8] Defendant has not objected to this testimony, or any other evidence, as hearsay.

that she had worked for seventeen years as a dispatcher "with much success." (Pl. Dec. ¶ 6).[9]

Moreover, Plaintiff presents evidence showing that Marlow made both an implicit threat -- "I would never have to worry about a job again if I was with him" -- and an express threat -- "don't you tell anybody about last night . . . if you do, you'll lose your job." *Cf. Johnson*, 234 F.3d at 506 (supervisor stated "I like you and as long as I like you you're going to be all right. You don't have to worry about your job"); *Frederick*, 246 F.3d at 1312 (noting that plaintiff need not provide evidence of a direct and express sexual demand to make a claim under the "tangible employment action" theory). A reasonable fact-finder could conclude that Marlow effected the employment actions to cause Plaintiff "to worry about a job," or simply in retaliation for her failure to give in to his sexual advances. The causal link is further strengthened by the very close temporal proximity between the alleged harassment and the employment actions.

For these reasons, the Court finds that Plaintiff has demonstrated that an issue of fact exists as to whether the harassment she suffered "culminated in a tangible employment action." *See Johnson*, 234 F.3d at 512 (finding issue of fact existed as to causation); *see also Llampallas*, 163 F.3d at 1247 (noting that a plaintiff may establish the causal link by showing that harasser took action against plaintiff). As a result, for the purposes of summary judgment, Defendant may not rely on the *Faragher-Ellerth* defense. Plaintiff therefore establishes the fifth element of her prima facie

---

[9] In opinions subsequent to *Johnson*, the Eleventh Circuit has found that the plaintiff failed to prove causation on the basis of facts which would traditionally be considered non-discriminatory reasons for the challenged employment action. *See Cotton*, 434 F.3d at 1232 (finding plaintiff failed to demonstrate causation where plaintiff testified that the reduction in her hours had been discussed prior to her hiring); *Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1300 (11th Cir. 2007) (finding no genuine issue of fact as to causation where evidence indicated plaintiff was terminated because she refused employer's remedial offers). Although Plaintiff's performance problems are relevant to her ability to prove causation, the evidence regarding her performance is not undisputed as in the foregoing cases, and it is therefore not sufficient to warrant summary judgment in favor of Defendant.

case: a basis for holding Defendant liable for Marlow's alleged harassment.[10]

### 2.      *Severe or pervasive conduct*

Defendant also argues that Plaintiff has failed to prove the fourth element of her *prima facie* case: that Marlow's alleged harassment was severe and pervasive.  It is well-established, however, that when "a supervisor retaliates against a worker for failing to give in to sexual advances, those advances will rise to the level of 'severe or pervasive." *Johnson*, 234 F.3d at 508; *Cotton*, 434 F.3d at 1231 (noting that plaintiff may prove sexual harassment by demonstrating a tangible employment action *or* severe or pervasive conduct).  As set forth above, there is sufficient evidence to create an issue of fact as to whether Marlow retaliated against Plaintiff for failing to give in to his sexual advances.

Based on the foregoing, the Court finds that Plaintiff has established a prima facie case of sexual harassment.  Defendant's motion for summary judgment on Plaintiff's hostile work environment claims (Count I) is therefore denied.

### B.      *Retaliation*

### 1.      *Prima facie case*

In Count II, Plaintiff alleges that Defendant retaliated against her for reporting Marlow's alleged sexual harassment on January 23, 2006.  In order to state a prima facie case of retaliation, Plaintiff must present evidence that: (1) she engaged in statutorily protected conduct; (2) she was adversely affected by an employment decision; and (3) there was a causal connection between the statutorily protected conduct and the adverse employment decision. *Drago v. Jenne*, 453 F.3d 1301, 1307 (11th Cir. 2006).  In the instant motion, Defendant contends that Plaintiff is unable to establish

---

[10] The Court makes no finding as to Defendant's ability to assert, or prove, this defense at trial.

any element of her prima facie case.

Plaintiff engaged in statutorily protected activity by making an informal complaint and utilizing Defendant's internal grievance procedures. *Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 716 n.2 (11th Cir. 2002); *Rollins v. State of Fla. Dep't of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989). Nonetheless, Defendant argues that Plaintiff fails to show that her belief that Defendant was engaged in unlawful employment practices "was objectively reasonable in light of the facts and record presented." *Little v. United Techs.,* 103 F.3d 956, 960 (11th Cir.1997). The objective reasonableness of Plaintiff's belief "must be measured against existing substantive law." *Clover v. Total Sys. Serv., Inc.,* 176 F.3d 1346, 1351 (11th Cir.1999).

As discussed above, Plaintiff has established a prima facie case as to sexual harassment based on her version of the facts. This is sufficient to demonstrate that Plaintiff had a good faith, reasonable belief that Marlow engaged in sexual harassment. *Cf. Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 586 (11th Cir. 2000) (noting that plaintiff met this requirement even though she failed to prove a prima facie case).

With respect to the second element, Defendant concedes that Plaintiff's termination constitutes an adverse employment action, but argues that the reprimand contained in the Feedback Form does not constitute an adverse employment action. (Dkt. 15 at 23). When a formal reprimand results in tangible job consequences, it may amount to an adverse employment action. *Davis v. Town of Lake Park*, 245 F.3d 1232, 1241 (11th Cir. 2001). In the instant case, there is, at the very least, an issue of fact as to whether the Feedback Form resulted in Plaintiff's termination and whether it can thus be considered a separate employment action. For the purposes of the following analysis, however, the Court refers to the issuance of the Feedback Form and Plaintiff's termination

collectively as the "termination."[11]

Plaintiff has also adequately established a causal connection between her protected activity and her termination. The causal link element is broadly construed so that "a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1278 (11th Cir. 2008); *Simmons v. Camden County Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir. 1985). A plaintiff establishes causation if she provides evidence that the decisionmaker was aware of the protected conduct, and that there was close temporal proximity between this awareness and the adverse employment action, *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999), or other evidence "'that the protected activity and the adverse action were not wholly unrelated.'" *Gupta,* 212 F.3d at 590.

For the purposes of summary judgment, the Court assumes that Meli directed Plaintiff's termination, as Maits testified. It is undisputed that Meli was aware of Plaintiff's protected activity. Plaintiff's termination occurred on February 16, 2006, approximately three weeks after Plaintiff first reported the harassment to Meli. These facts, in addition to the evidence of pretext discussed below, are sufficient to demonstrate the requisite causal link. *See Farley*, 197 F.3d at 1337 (finding causal link where plaintiff was fired seven weeks after informing defendants that he filed an EEOC charge); *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163-64 (11th Cir. 1993) (finding causal link where transfer occurred three weeks after plaintiff informed defendant that she intended to file an EEOC complaint).

**2.    *Non-discriminatory reason and pretext***

Defendant contends that it had a non-discriminatory reason for Plaintiff's termination.

---

[11] Because Defendant's motion for summary judgment as to the retaliation claim is denied on the basis of Plaintiff's termination, Plaintiff's suspension with pay is not separately evaluated as an adverse employment action.

Specifically, Meli avers that Plaintiff's "refusal to participate in the program and unwillingness to work in harmony with her coworkers resulted in the terminated of her employment."[12] (Meli Aff. ¶ 10).

Plaintiff argues that Defendant's stated reason is a mere pretext for unlawful retaliatory animus. Pretext may be proven "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Rice-Lamar v. City of Ft. Lauderdale*, 232 F.3d 836, 843 (11th Cir. 2000). Plaintiff must produce evidence "sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006). "The ultimate burden of proving by a preponderance of the evidence that the reason provided by the employer is a pretext for prohibited, retaliatory conduct remains on the plaintiff." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001).

When an employer, as here, relies on a plaintiff's violation of a work rule as the legitimate reason behind the adverse employment action, a plaintiff may demonstrate that the "work rule defense" is pretextual if she submits evidence that: (1) she did not violate the cited work rule; or (2) if she did violate the rule, other employees outside the protected class, who engaged in similar acts, were not similarly treated. *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1363 (11th Cir. 1999).

---

[12] In the motion for summary judgment, Defendant argues that Plaintiff's poor performance justified her termination. (Dkt. 15 at 23-24). Meli did not, however, cite this as a reason for Plaintiff's termination. While Defendant's burden of production is light, the Eleventh Circuit has expressly held that "there must be evidence that asserted reasons for discharge were actually relied on or the reasons are not sufficient to meet defendant's rebuttal burden." *IMPACT v. Firestone*, 893 F.2d 1189, 1194 (11th Cir. 1990) (internal quotations omitted). As Defendant has pointed to no record evidence that it considered Plaintiff's performance record in making the decision to terminate Plaintiff, the Court does not evaluate this as one of Defendant's non-discriminatory reasons.

20

Taking Plaintiff's version of the facts as true, it does not appear that she ever refused to complete the Training Record with Maits, as Defendant asserted in the Feedback Form. Rather, Plaintiff, along with Stailey, took the Training Record home to complete. There is no evidence that Maits told Plaintiff to bring the Training Record back at a certain time or that Plaintiff ever refused to turn in the Training Record before being presented with the Feedback Form. There is no evidence that Plaintiff had otherwise refused to participate in training. Accordingly, Plaintiff has presented sufficient evidence to call into question Defendant's stated reliance on Plaintiff's alleged "insubordination" as a violation of Defendant's Standards of Conduct. *See Damon*, 196 F.3d at 1363 (finding issue of fact as to whether plaintiff was properly fired for using profanity when he testified he did not use profanity).

As to Plaintiff's "unwillingness to work in harmony with her coworkers," the second cited reason for Plaintiff's termination, Meli does not describe any specific instances of such conduct, other than Plaintiff's verbal abuse of Maits. (Meli Aff. ¶ 10). Plaintiff testified that she did not say "Bitch, let me leave," or words to that effect. (Pl. Dep. at 261). Moreover, another witness, Wanda Ward, testified that Maits bragged about setting Plaintiff up the night she was terminated. (Ward Dep. at 12-13). Again, this evidence is sufficient to call into question Defendant's stated reliance on Plaintiff's unwillingness to work harmoniously with her coworkers.

Finally, as general evidence of a retaliatory motive, Plaintiff notes that Marlow and Meli previously discussed methods to terminate Plaintiff during the sexual harassment investigation. Specifically, Marlow testified:

> Well, I think [Meli] gave me some options. Because, to me, you know, again, that was personal stuff. I said, "Let her go." He said, "You can't just let someone go like that." And he said, you know, you could offer to buy someone out at pay or something like that. (Marlow Dep. at 95).

21

Shortly thereafter, Meli allegedly directed Maits to issue the Feedback Form, with the allegedly false charge of insubordination.

It is the court's responsibility "for drawing the lines on what evidence is sufficient to create an issue on pretext." *Rojas v. Florida*, 285 F.3d 1339, 1344 (11th Cir. 2002). This Court is mindful that Title VII does not authorize a court to "sit as a super-personnel department that reexamines an entity's business decisions," *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000), or to adjudge "whether employment decisions are prudent or fair," *Rojas*, 285 F.3d at 1342. In this case, however, there is sufficient evidence from which a reasonable fact-finder could conclude that the reasons given by Defendant were not the real reasons for Plaintiff's termination. *Hurlbert*, 439 F.3d at 1298.

Defendant's motion for summary judgment is accordingly denied on Plaintiff's claims for retaliation (Count II).

### Conclusion

Based on the foregoing, it is **ORDERED AND ADJUDGED** that Defendant's Motion for Summary Judgment (Dkt. 15) is **DENIED**.

**DONE AND ORDERED** in chambers this _8th_ day of April, 2008.

**JAMES D. WHITTEMORE**
**United States District Judge**

Copies to:
Counsel of Record

22